# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

UNITED STATES OF AMERICA

      Plaintiff,

v.                                Case No. 06-20108-JWL

RODERICK C. WRIGHT II,

      Defendant.

## MEMORANDUM & ORDER

This criminal action arises out of defendant Roderick C. Wright II's enlistment and subsequent discharge from the United States Army. Count 1 of the superceding indictment (doc. 39) charged Mr. Wright with interstate stalking in violation of 18 U.S.C. § 2261A; Count 2 charged him with impersonating a Second Lieutenant in the United States Army in violation of 18 U.S.C. § 912. A bench trial regarding this matter was held from July 17, 2007, to July 19, 2007. Therein, at the close of the government's evidence, the court granted Mr. Wright's motion for judgment of acquittal with respect to Count 1 but denied it with respect to Count 2.

The court is now prepared to issue its findings of fact and conclusions of law regarding Count 2. For the reasons set forth below, the court concludes that the Government has proven each of the elements of Count 2 beyond a reasonable doubt. Accordingly, the court finds Mr. Wright guilty of the charges contained in Count 2 of the superceding indictment.

## I.  Findings of Fact

In October of 2005, Mr. Wright was enrolled in the United States Army Officer Candidate School ("OCS") at Fort Benning, Georgia.  On November 1, 2005, Army Major Carl Bergmann, the commanding officer of the OCS company to which Mr. Wright was assigned, gave a verbal direct order to Mr. Wright to have no contact with Pamela Hall, a fellow Officer Candidate ("OC") in the company.  Over the Thanksgiving holiday, Mr. Wright did have contact with OC Hall and Major Bergmann issued a second no contact order to Mr. Wright directing him once again to have no contact with OC Hall.  During Christmas Exodus,[1] Mr. Wright again violated the no-contact orders issued by Major Bergmann.  Major Bergmann became aware of the violation on January 2, 2006.

As a result of Mr. Wright's violations of the no-contact orders, proceedings were initiated to separate him from the United States Army in January of 2006.  Mr. Wright received various communications informing him of the separation proceedings and his rights with respect to such proceedings, including: a Report to Suspend Favorable Personnel Actions (a "Flag") dated January 20, 2006; a Developmental Counseling Form dated January 23, 2006; a memorandum dated January 25, 2006, from Major David Daniels which informed Mr. Wright that Major Daniels had initiated a separation action for commission of a serious offense and recommended a general discharge; a memorandum dated January 26, 2006, from David L. Roberts, civilian defense counsel, initialed by Mr. Wright which informed him of his rights; and a  memorandum

---

[1]Christmas Exodus is the term given to the time the OCs are allowed to take leave during the Christmas and New Year's holidays.

dated February 1, 2006, from Emeka Nwofili, CPT JA defense counsel, initialed by Mr. Wright, which notified him of the contemplated action to separate him for Misconduct–Commission of a Serious Offense and the potential consequences of such action.  In memorandums dated January 30, 2006, and February 1, 2006, Mr. Wright submitted statements on his behalf which demonstrated an apparent lifelong obsession with the military and his intense desire to serve as an officer in the United States Army.  Mr. Wright also indicated in those statements that he believed his violation of the no-contact orders did not warrant his removal from OCS or complete separation with anything less than an Honorable Discharge.  Despite these statements, Mr. Wright received orders dated February 9, 2006, which indicated that he had been reassigned to the Army transition point for transition processing and informed him that after such processing he was discharged from the Army.  Subsequently, Mr. Wright received a DD Form 214[2] (the "misconduct DD 214") which formally discharged him from the United States Army with a separation date of February 10, 2006.  The Narrative Reason for Separation listed in block 28 of the DD 214 stated: "General Discharge, Serious Offense (Misconduct)."

Denise Parker, a civilian employee of the Department of the Army at Fort Benning, Georgia, who was authorized to sign DD 214s, personally met with Mr. Wright on February 10, 2006, the date of his discharge.  Mr. Wright told Ms. Parker that the "charges against him had been trumped up" but Ms. Parker informed Mr. Wright that his discharge packet was in order, including all appropriate actions by his chain of command and a review for legal sufficiency, and

---

[2]A DD Form 214 ("DD 214") is a "Certificate of Release or Discharge from Active Duty."

that she was required to discharge him in accordance with Army regulations.  Mr. Wright, however, refused to sign the DD 214; Ms. Parker informed him "eye-to-eye" that he was separated from the Army regardless of whether he signed the form or not and gave him copies of his DD 214 and separation orders.  At such time, Mr. Wright was formally discharged from the Army for misconduct, a serious offense.

On March 31, 2006, Mr. Wright was apprehended by the Military Police (MPs) at Fort Sill, Oklahoma.  Patricia Little, a special agent with the criminal investigations division at Fort Sill interviewed Mr. Wright on that day pursuant to her investigation of allegations that he was impersonating an officer.  SA Little recovered a number of documents from Mr. Wright that he was carrying with him on that day, including an identification card dated March 9, 2006, which portrayed Mr. Wright as a Second Lieutenant in the United States Army;[3] a DA Form 71[4] which indicated Mr. Wright had been sworn in as a Second Lieutenant on January 19, 2006; a DD 214 which indicated Mr. Wright had been separated from the army to accept a commission or warrant in the army on January 18, 2006 (the "anticipatory DD 214");[5]  a DD Form 1610 purporting to

_____

[3]It is unknown how Mr. Wright obtained this ID card.

[4]A DA Form 71 is an "Oath of Office-Military Personnel" used to create a record of the date of the acceptance of an appointment.  Typically, upon graduation from OCS, an OC takes the oath of office at a graduation ceremony with his or her fellow OCs.  In Mr. Wright's case, he printed up the DA 71 himself, took it to the county clerk in Columbus, Georgia, and had it notarized there.

[5]This type of DD 214 would be utilized to indicate a soldier was transitioning from enlisted status to officer status, such as when one graduates from OCS.  The origin of this particular DD 214 is unknown.  It may have been prepared in anticipation of Mr. Wright's graduation from OCS, as the Army typically prepares such paperwork in advance.  Regardless, the subsequent misconduct DD 214 dated February 10, 2006, discharging Mr. Wright for his violation of the no contact orders, superceded this anticipatory DD 214.

authorize Mr. Wright to travel from Ft. Benning on February 24, 2006 to Fort Sill;[6] and orders dated January 5, 2006, showing that Mr. Wright was ordered to report to Fort Stewart, Georgia on September 25, 2006.[7]

In his interview with SA Little, Mr. Wright indicated that he was at Fort Sill because there was a mix-up involving his pay and that he was a soldier who was supposed to be continuing his training at Fort Sill.  SA Little consulted a military computer database known as DEEDS which contained information on all enlisted soldiers and did not discover Mr. Wright's name there.  The absence of Mr. Wright's name in the database indicated to SA Little that Mr. Wright was no longer in the military and thus he should not have had an identification card or orders.  SA Little confronted Mr. Wright about this and directed him to access his myPay web page[8] if he wanted to prove to her that he was still in the Army but Mr. Wright refused.  During the course of the interview, Mr. Wright never mentioned nor produced the DD 214 dated February 10, 2006, which indicated he had been discharged from the Army for misconduct.

---

[6]A DD Form 1610 is a "Request and Authorization for TDY [Temporary Duty] Travel of DOD Personnel" used to authorize travel. SA Little testified that this particular DD 1610 raised her suspicions because it was dated February 24, 2006, but indicated it had been faxed on March 15, 2006.  Furthermore, this form is a 1967 version of the DD 1610 and SA Little testified that the Army currently uses an automated 2001 version.

[7]Barbara Richey, the employee at Fort Benning who faxed these orders to Mr. Wright testified, through stipulation of the parties, that had she known that he had been discharged from the Army on February 10, 2006, she would not have issued a copy of the orders to him.  These orders also appear suspicious as they are dated January 5, 2006, but indicate they were faxed on March 21, 2006.

[8]myPay is a military web page that allows soldiers to manage, among other things, their pay information, leave and earning statements, and W-2s. *See* https://mypay.dfas.mil. SA Little testified that any actively enlisted soldier would have been able to access myPay.

As a result of her interview and investigation, SA Little concluded that Mr. Wright was no longer a soldier enlisted in the Army, much less a commissioned officer.  Subsequently, Mr. Wright was escorted off Fort Sill by the MPs for impersonating an officer, was emphatically informed in no uncertain terms that he was neither an officer nor an enlisted solder in the United States Army, and was ordered to never return to Fort Sill.

As part of her further investigation, SA Little found Mr. Wright's website online and a number of pages depicting that website's content were admitted at trial.  On this website, Mr. Wright repeatedly expressed his opinion that the Army was wrong to discharge him; that the situation had been manipulated by OC Hall; that he had not done anything wrong; and included a statement from Mr. Wright that "[t]he Army is my life."

In April of 2006, Mr. Wright contacted Sergeant First Class Mack Jackson, a recruiter for the Kansas National Guard, and inquired about joining the National Guard.  Mr. Wright then met with Sergeant Jackson and Captain Leonard Leivan, the company commander for the field artillery unit Mr. Wright sought to join.  Captain Leivan was involved because, due to the nature of the discharge Mr. Wright had received from the Army, Sergeant Jackson needed the approval of a company commander to move forward with the process of allowing Mr. Wright to join the National Guard.  After an interview with Mr. Wright, Captain Leivan signed a letter requesting that Mr. Wright receive a waiver to become a member of the National Guard; that letter received two subsequent approvals but never received final approval.  Mr. Wright also provided a written statement to Sergeant Jackson, which was required of any person requesting a waiver, indicating the circumstances of his discharge.  In that statement, Mr. Wright acknowledged that he was

separated from OCS and the Army for failure to follow a direct order.  After meeting with Sergeant Jackson, Mr. Wright continued to call him about once a week to inquire about the status of his application.

Sometime in mid-April, Mr. Wright called the personnel office at Fort Sill and spoke with Nelson Norman II, who managed the officer records at Fort Sill.  Mr. Wright told Mr. Norman that he was checking on some paperwork that he had never received and that he had gone to Fort Sill to attend Officer Basic Course ("OBC")[9] but that when he went to the finance department, he was escorted off post by the MPs for impersonating an officer.  Mr. Norman then consulted TOPMIS, an officer's database, and informed Mr. Wright that according to TOPMIS, he was still in the system as a Second Lieutenant.  Mr. Norman also told Mr. Wright that the system indicated he had orders to go to Fort Hood in August and that he should get to the nearest installation and get any problems corrected.  Mr. Wright did not inform Mr. Norman that he had been discharged without graduating from OCS for misconduct and did not mention the misconduct DD 214.

On June 13, 2006, Timothy Butler, a non-commissioned officer with the Army Reserve in Belton, Missouri, spoke with Mr. Wright because  Mr. Wright was interested in becoming a commissioned officer in the Army Reserve.  After speaking with Mr. Wright, Sergeant Butler consulted PERNET, which is another military database that indicates whether a particular soldier is active in the reserves or is no longer in the military.  When Sergeant Butler accessed Mr.

---

[9]OBC is the next step of training for an OC who graduates from OCS.

Wright's information on PERNET, it indicated to him that Mr. Wright had been involuntarily discharged for misconduct, a serious offense, AWOL.  Mr. Wright disagreed that he had been discharged for being AWOL, and Sergeant Butler informed him that he needed to speak with the discharging unit, which in Mr. Wright's case was OCS at Fort Benning, and correct the military records.

In July of 2006, Mr. Wright called Fort Leavenworth and spoke with Brett Rosene, who was the chief of the personnel automation branch at the Fort Leavenworth Adjutant General's office ("AG's office").  Mr. Wright indicated to Mr. Rosene that he had just completed OCS but that there had been some sort of mix-up and that he had been escorted off post at Fort Sill by military police for impersonating an officer.  He indicated to Mr. Rosene that he was supposed to "report to the school house" at Fort Sill; Mr. Wright's use of the phrase "school house" indicated to Mr. Rosene that Mr. Wright was a newly commissioned officer who was supposed to get his OBC in the field artillery branch at Fort Sill.  Mr. Rosene then advised Mr. Wright that he should speak with Lawrence DeSouza.  At no time did Mr. Wright inform Mr. Rosene that he had received a general discharge in February of 2006 for serious misconduct nor did he mention the misconduct DD 214.

Per Mr. Rosene's instructions, Mr. Wright subsequently telephoned Lawrence DeSouza, who was the project manager of the AG's office at Fort Leavenworth, Kansas, and identified himself as Lieutenant Wright and stated that he was having pay problems in that he had not been paid for a number of months.  Mr. Wright also informed Mr. DeSouza that he had been escorted off Fort Sill for impersonating an officer and did not want the same problem repeated at Fort

8

Leavenworth.  Mr. DeSouza assured Mr. Wright that he shouldn't have any difficulty gaining access to the post with either a military sticker or through the visitation line with proper identification.  Mr. DeSouza then set up a meeting with Mr. Wright at Fort Leavenworth for the following week.

On July 18, 2006, Mr. Wright went to Fort Leavenworth and told Mr. DeSouza that ever since he graduated from OCS in Fort Benning he had been having issues with his pay.  Mr. Wright told Mr. DeSouza that he had proceeded to OBC at Fort Sill but was turned  away for impersonating on officer.  Mr. Wright provided Mr. DeSouza with the DA 71 oath of office form referenced above, the anticipatory DD 214 which showed he had been separated to accept a commission or warrant with the Army, and a Request for Orders (RFO) indicating that Mr. Wright was supposed to attend OBC at Fort Sill.

Mr. DeSouza took Mr. Wright to the ID card section and had an employee look him up in DEERS, another military database, to determine if Mr. Wright was on active duty.  The DEERS system showed that Mr. Wright was indeed a Second Lieutenant in the United States Army.  After learning this, Mr. DeSouza directed that Mr. Wright be issued an ID card and left Mr. Wright in the ID card section with instructions to return to Mr. DeSouza's office when he was finished.  Mr. Wright did not provide Mr. DeSouza with a copy of the misconduct DD 214 showing he had been discharged from the Army in February of 2006.  Had Mr. Wright shown Mr. DeSouza the misconduct DD 214, Mr. DeSouza would not have directed that Mr. Wright be issued an ID card because the DD 214 would have clearly indicated to Mr. DeSouza that Mr. Wright was no longer affiliated with the military.

9

Mr. DeSouza then returned to his office and contacted the Army Human Resources Command (HRC) in Alexandria, Virginia, to figure out what the problem was. HRC, however, informed Mr. DeSouza that Mr. Wright had been separated from the Army and had been disqualified from the OCS program for serious misconduct. Once Mr. DeSouza learned this information, he went back to the ID card section only to find that Mr. Wright had proceeded to the finance office.

Meanwhile, Mr. Wright took the ID card that had been issued to him, showing that he was a Second Lieutenant in the Army, with him to the finance office where he first met with Sharon Schroeder, who was the director of military pay operations at Fort Leavenworth. Mr. Wright told Ms. Schroeder that he had been to the personnel office and that they had sent him to finance because he hadn't been paid since February, and produced the ID card that he had just been issued indicating he was a Second Lieutenant. Ms. Schroeder then turned Mr. Wright over to Nancy Parsons, another employee in the finance office, who proceeded to attempt to help Mr. Wright.

Mr. Wright then spoke with Ms. Parsons, telling her that he had just gotten an ID card and that Mr. DeSouza had directed him to the finance office to get his pay "straightened out." Mr. Wright told her that his pay had stopped and that he needed to get it started again. Ms. Parsons took Mr. Wright's newly issued ID card and received a number of documents from Mr. Wright. These documents included: what purported to be a certificate signed by President George W.

Bush recognizing Mr. Wright as a Second Lieutenant in the Army;[10] the DD 1610 he had presented to SA Little; assignment instructions dated December 27, 2005, directing Mr. Wright to report to Fort Sill on April 4, 2006; and the orders dated January 5, 2006, he had presented to SA Little.  Ms. Parsons used the social security number on the ID card to look him up in her computer under the Defense Joint Military System (DJMS).  At no time did Mr. Wright produce the misconduct DD 214 showing he had been discharged on February 10, 2006, nor did he notify Ms. Schroeder or Ms. Parsons about that DD 214.

After consulting DJMS, Ms. Parsons confirmed that Mr. Wright's pay had stopped on February 10, 2006.  Ms. Parsons asked Mr. Wright what was going on and he indicated that he had been at OCS from October of 2005 until January 19, 2006, at Fort Benning.  She then asked why he was not at Fort Benning and he indicated that he was TDY (Temporary Duty) at Fort Sill.  Ms. Parsons asked why he did not have the problem taken care of at Fort Sill and Mr. Wright told her that he was escorted off base there for impersonating an officer and was banned from post.  At that point, Ms. Parsons recognized that there was a problem; she  indicated as much to Ms. Schroeder and explained to her what Mr. Wright had just told her.

Ms. Schroeder then contacted the finance office at Fort Sill to verify Mr. Wright's information and the person at Fort Sill said they would call Ms. Schroeder back.  Ms. Schroeder then received a call from Fort Sill directing her to proceed to another telephone, outside of Mr.

---

[10]After his arrest at Fort Leavenworth, an envelope with the return address of www.citationexpress.com was located in Mr. Wright's vehicle.  The website sells replicas of certificates such as this one that Mr. Wright gave to Ms. Parsons.

Wright's presence, and call Fort Sill.  Ms. Schroeder left the room and Ms. Parsons instructed Mr. Wright to begin filling out paperwork in anticipation of the situation just being a misunderstanding that would require re-starting his pay.  Mr. Wright filled out a DA Form 5960, which is an authorization to start housing allowance, and a DD Form 1351-2, which is a travel voucher, and indicated on both forms that his duty location was OBC Fort Sill, Oklahoma, and that his grade was 01, which is Second Lieutenant.

Meanwhile, Ms. Schroeder did as instructed by the person at Fort Sill, and upon returning the call to Fort Sill, was told that Mr. Wright may potentially be dangerous and to call the CID or MPs and have them take care of the situation immediately.[11]  Ms. Schroeder then contacted the MPs, who arrived shortly thereafter.  Mr. Wright was subsequently informed of his rights and gave a statement and interview to  CID Special Agent Parker.  Mr. Wright indicated to SA Parker that he was chaptered out of the military for misconduct–the commission of a serious offense, and that the serious offense was failure to obey a lawful order.  Mr. Wright stated that he had not disobeyed any lawful orders given to him and that it was actually OC Hall who kept approaching him, causing the discharge.  Mr. Wright also stated that he refused to sign the misconduct DD 214 because: "I did not believe I committed a serious offense nor did I believe the medals section was correct . . . I used my own judgment and decided I should report to Fort Sill.  The Army is hurting so bad for officers . . . [h]ow could they possibly afford to kick me out?  I didn't even worry about it."  Following these events, Mr. Wright was indicted in the case

---

[11]Ms. Schroeder and Ms. Parsons testified that Mr. Wright did not appear dangerous to them.

that is currently before the court.

## II.  Conclusions of Law

For the court to enter a guilty verdict in this case, it must find that the Government proved beyond a reasonable doubt that Mr. Wright violated 18 U.S.C. § 912.[12]  Section 912 criminalizes two types of conduct. *United States v. Milton*, 421 F.2d 586, 587 (10th Cir. 1970)(citations omitted); *United States v. Harth*, 280 F. Supp. 425, 426 n.4 (1968).  *See also United States v. Rippee*, 961 F.2d 677, 678 (7th Cir. 1992); *United States v. Wilkes*, 732 F.2d 1154, 1156 n.2 (3d Cir. 1984); *United States v. Rosser*, 528 F.2d 652, 654 n.4 (D. C. Cir. 1976).  The first part of the statute criminalizes falsely pretending to be a federal official and acting as such; the second part criminalizes falsely pretending to be a federal official and demanding or obtaining something of value.  *Harth*, 280 F. Supp. at 426; *Rippee*, 961 F.2d at 678.

The indictment charges Mr. Wright with both types of conduct;[13] the court may enter a

---

[12]Section 912 provides:

[w]hoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 912.

[13]The relevant language of the indictment states:

Roderick C. Wright II, unlawfully and falsely assumed and pretended to be an officer acting under the authority of the United States, acted as such, and in such pretended character demanded money, in that he falsely pretended to be a Second Lieutenant in the United States Army, represented to personnel at Fort Leavenworth, Kansas, that he was entitled to a card identifying him as a Second Lieutenant in the United States Army and, after obtaining that identification card, demanded from other personnel at

verdict of guilty, however, if it determines that the government has proven only one type of conduct beyond a reasonable doubt. *See United States v. Powell*, 226 F.3d 1181, 1192 n.4 ("As we have noted, it is 'hornbook law that a crime denounced in the statute disjunctively may be alleged in an indictment in the conjunctive, and thereafter proven in the disjunctive.'")(quoting *United States v. Gunter*, 546 F.2d 861, 868-69 (10th Cir. 1976).

A.     *Falsely Pretending*

First, the court must determine whether Mr. Wright falsely pretended to be a Second Lieutenant in the United States Army on July 18, 2006, at Fort Leavenworth, as is charged in the indictment.  To falsely pretend to be a Second Lieutenant, Mr. Wright must have known that such pretension was false.  *See* Tenth Circuit Pattern Criminal Jury Instruction 2.40 (providing that the government must prove beyond a reasonable doubt that: "the defendant knew that such assumption or pretension was false").

A close examination of the witnesses' testimony and the exhibits admitted in this case reveals multiple indications that on July 18, 2007, Mr. Wright knew he had been discharged from the Army and was not an enlisted soldier, much less a Second Lieutenant.  The record clearly shows that in January of 2006, Mr. Wright received extensive documentation at Fort Benning notifying him that he had violated direct no-contact orders and that, as a result of such violations, separation proceedings against him had commenced.  This culminated in the misconduct DD 214 that Ms. Parker discussed with him "eye-to-eye" and he refused to sign.

---

Fort Leavenworth the pay to which he was supposedly entitled.

Perhaps most importantly, Mr. Wright was discharged without graduating from OCS, a prerequisite to obtaining Second Lieutenant rank in the Army by the route he had pursued.

Moreover, in the written statement Mr. Wright submitted to Sergeant Johnson in support of his quest to become a member of the Kansas National Guard, Mr. Wright states that he was separated from OCS and the Army for failure to follow a direct order.  Mr. Wright made similar admissions in the statement he provided to SA Parker following his detention at Fort Leavenworth, stating that he was chaptered out of the military for misconduct–commission of a serious offense for failure to obey a lawful order.  These statements further indicate Mr. Wright's knowledge that he had been formally discharged from the Army for misconduct.

If, for argument's sake, Mr. Wright was at one point in time confused as to his status in the Army, any such misconception was firmly clarified when he was escorted off Fort Sill by the MPs, informed he was neither an officer nor an enlisted soldier, and ordered to never return to Fort Sill.  This conclusion is further bolstered by the fact that subsequent to the incidents at Fort Sill, Mr. Wright attempted to join the National Guard and the Army Reserve.  Such actions indicate to the court that Mr. Wright knew he was not a member of the Army due to his miscondischarge.

The court notes that, through a mistake or system glitch, Mr. Wright appeared as a Second Lieutenant in some of the Army databases despite the misconduct DD 214 that had been issued in February of 2006.  Specifically, Mr. Wright was told by Mr. Norman at Fort Sill and Mr. DeSouza at Fort Leavenworth that he showed up as a Second Lieutenant in the database.  Notably, however, Mr. Wright never mentioned the misconduct DD 214 to Mr. Norman or Mr.

DeSouza.  Furthermore, the conversation with Mr. Norman and the meeting with Mr. DeSouza happened after Mr. Wright was escorted off Fort Sill, an event which clearly indicated to Mr. Wright that he was not even in the Army anymore, much less a Second Lieutenant.  Therefore, despite the mistakes in some of the Army databases, the court finds beyond a reasonable doubt that Mr. Wright in fact knew that he was not a Second Lieutenant in the Army on July 18, 2006.

The court must also determine whether, armed with the knowledge that he was not a Second Lieutenant in the Army, Mr. Wright falsely pretended to be a Second Lieutenant on July 18, 2006, at Fort Leavenworth.  Based on the credible testimony of Mr. DeSouza, Ms. Schroeder, and Ms. Parsons, the court concludes beyond a reasonable doubt that he did.  First, the court notes that when Mr. Wright first contacted Mr. DeSouza, he identified himself as "Lieutenant Wright."  Furthermore, when Mr. Wright met with Mr. DeSouza, he presented him with documents purporting to represent him as a Second Lieutenant, which, taken in context with Mr. Wright's initial identification as a Lieutenant, amounted to a false representation to Mr. DeSouza that he was in fact a Second Lieutenant.  Next, Mr. Wright presented the wrongly issued identification card showing him as a Second Lieutenant to Ms. Schroeder and Ms. Parsons in the finance office and presented them with documentation purporting to show he was a Second Lieutenant.  Such actions clearly indicate that Mr. Wright falsely pretended to be a Second Lieutenant.

The court rejects Mr. Wright's argument that his actions at Fort Leavenworth merely indicate a good faith inquiry into his status with the Army.  As indicated above, the court finds that Mr. Wright did not have any doubts that he was in fact discharged from the Army.

16

Furthermore, if Mr. Wright did have doubts and was truly attempting to determine his status with the Army, he would have disclosed the misconduct DD 214 to Mr. DeSouza.  Instead, he presented the anticipatory DD 214 as well as other documents of questionable authenticity, such as the oath of office and request for orders, and told Mr. DeSouza there had been a mix-up at Fort Sill.  In fact, any potential "mix-up" had been clarified at Fort Sill, when Mr. Wright was escorted off post by the MPs.  Thus, the court refuses to accept Mr. Wright's explanation that he was simply trying to find out where he stood with the Army in July of 2006.

There is no question that Mr. Wright desperately wanted to be an officer in the Army and disagreed with his discharge, as indicated by his statements made during the Fort Benning separation proceedings, his actions in attempting to join the National Guard and Army Reserve, and the postings on his website.  Although the court recognizes this desire, it is not a justifiable basis for him to disregard the fact that he received a misconduct discharge.[14]  Accordingly, the court finds beyond a reasonable doubt that Mr. Wright falsely pretended to be a Second Lieutenant in the Army on July 18, 2006, at Fort Leavenworth.

B.    *Acting as Such or Demanding Money*

As discussed above, § 912 criminalizes two types of conduct.  In this case, Mr. Wright has been charged with both types of conduct: (1) impersonating a Second Lieutenant and acting as such and (2) impersonating a Second Lieutenant and demanding money.  Although the court need only find that Mr. Wright engaged in one of the types of conduct, it concludes that his

---

[14]This desire does, however, enlighten the court as to Mr. Wright's motive for engaging in the actions that are the subject of this trial.

actions in this case satisfy both types of conduct criminalized by § 912.

To find Mr. Wright guilty of the first type of conduct criminalized by § 912, the court must determine not only whether he falsely pretended to be a Second Lieutenant, but also whether he "acted as such."   In other words, the court must decide whether Mr. Wright committed an overt act in furtherance of his impersonation of a Second Lieutenant. *See Dickson v. United States*, 182 F.2d 131, 132 (10th Cir. 1950)(stating that to constitute an offense under 18 U.S.C. § 912, "[t]here must be the false representation of being an officer . . . and some overt act in keeping with the false pretense").  In determining whether a defendant "acted as such" in the context of § 912, courts have required varying degrees of independence between the overt act and the original act of impersonation.

For example, in determining the sufficiency of an indictment, some courts have held that a general allegation that the defendant acted consistently with the impersonations was enough to satisfy the overt act requirement.  *See United States v. Gayle*, 967 F.2f 484, 487 (11th Cir. 1992)("An indictment under 18 U.S.C. § 912 is sufficient if it contains general allegations of impersonating and acting as a federal officer; an indictment need not allege additional acts beyond the general act of impersonation."); *United States v. Cohen*, 631 F.2d 1223, 1224-25 (5th Cir. 1980)(holding that an indictment which alleged defendant signed in at a Federal penitentiary as the Associate Attorney General and told an inmate that he was the Associate Attorney General was "sufficient to describe 'acting' even though it also describes 'assuming and pretending'").

On the other hand, some cases have held that a violation of § 912 requires "something more than merely an act in keeping with the falsely assumed character." *United States v. Rosser*,

528 F.2d 652, 657 (D. C. Cir. 1976).  *See also United States v. Gilbert*, 143 F.3d 397, 398-99 (8th Cir. 1998).   In *Gilbert*, the defendant Gilbert was stopped by two police officers for speeding.  *Id*. at 397.  When asked for his license and registration, Gilbert produced a United States Customs Inspector badge and said that he was a United States Customs Agent.  *Id*.  When asked for further identification, the defendant repeatedly referred to his employment with the Customs Service; Gilbert, however, was not a Customs Agent.  *Id*.  In determining that such acts were sufficient to satisfy the "act as such" requirement of § 912, the Eighth Circuit noted that it "[requires] reliance on the impersonator's assertion of authority" and is satisfied if the "'deceived person [follows] some course he would not have pursued but for the deceitful conduct.'" *Id*. at 398 (quoting *United States v. Robbins*, 613 F.2d 688, 691 (8th Cir. 1979)).  The court went on to find that "the jury could reasonably infer that Gilbert attempted to avoid a ticket by falsely implying that he was on the way to some work related emergency" and that such act "reasonably caused the police 'to follow some course [they] would not have pursued but for the deceitful conduct" and that the conduct involved more than "a naked misrepresentation [or] mere bravado or puffing." *Id*. at 399.

In *United States v. Emerson*, 47 F.3d 1171, 1995 WL 57424, at *2 (6th Cir. Feb. 10, 1995), the defendant approached an individual and inquired about entering into a business relationship with him.  1995 WL 57424, at *1.  After the individual rejected the defendant's offers, the defendant presented what appeared to be marked as FBI identification, identified himself as an FBI agent, told the individual he was going to take him downtown for questioning, and insisted that the individual get in the defendant's car.  *Id*.  In determining whether there was

sufficient evidence that the defendant had committed an overt act, the Sixth Circuit noted the disagreement among the cases but concluded that the defendant actively pretended to be acting under an FBI agent's authority by ordering the individual to accompany him downtown. *Id.* The court concluded that such actions were sufficient to violate the statute, regardless of what standard regarding the "acts as such" requirement was used. *Id.* at *2-3. The court reaches a similar conclusion here.

In this case, Mr. Wright identified himself to Mr. DeSouza as a Second Lieutenant and, at their subsequent meeting, presented documentation purporting to depict him as a Second Lieutenant. Mr. Wright did not, however, disclose the misconduct DD 214 to Mr. DeSouza Based on Mr. Wright's representations, his failure to disclose the misconduct DD 214, and the system error in the Army database, Mr. DeSouza directed that an ID card be issued to Mr. Wright identifying him as a Second Lieutenant. Mr. Wright then took the ID card to the finance office and presented it and other documentation to Ms. Schroeder and Ms. Parsons in an attempt to have his pay restarted. Mr. Wright proceeded to fill out a housing allowance form and a travel voucher, indicating on both that he was a Second Lieutenant.

Clearly, these actions are more than just an act in keeping with the falsely assumed character. Mr. Wright went beyond merely pretending to be a Second Lieutenant; he acted under the authority of a Second Lieutenant by presenting the ID card to the finance office, stating that he wanted to get his pay straightened out, and filling out the forms that would provide him with money. *See Gilbert*, 143 F.3d at 398-99; *Emerson*, 1995 WL 57424, at *3. Furthermore, Mr. Wright's deceitful conduct reasonably caused Mr. DeSouza to engage in conduct he otherwise

would not have pursued, such as taking the steps which culminated in the issuance of the ID card after the mistaken information appeared on the computer. *See Gilbert*, 143 F.3d at 398-99. Therefore, the court concludes beyond a reasonable doubt that Mr. Wright falsely pretended to be a Second Lieutenant in the Army and acted as such in violation of 18 U.S.C. § 912 as charged in the superceding indictment.

Moreover, although not necessary to convict Mr. Wright in this case, the court finds that he engaged in the second type of conduct criminalized by the statute by falsely pretending to be a Second Lieutenant and demanding money. To support such a determination, the court must find that Mr. Wright falsely pretended to be a Second Lieutenant in order to obtain something of value, which in this case was money. In *United States v. Bryant*, 117 F.3d 1464, 1468 (D. C. Cir. 1997), the defendant Bryant parked his truck, which had a placard stating "United States Marshal" in the front window and various weapons visible in the rear compartment, near the entrance of a hotel in Washington D.C. *Id*. at 1466. When approached by law enforcement officers regarding the weapons and placard, Bryant identified himself as a Special Deputy U.S. Marshal. *Id*. It was later determined that Bryant held no official position with the Marshal's Service at the time of the incident. *Id*. Bryant testified at trial that while being detained, he was thinking about the trouble that the weapons might cause him and that he was aware his truck might be towed and that he might be taken to police headquarters. *Id*. at 1468. The D.C. Circuit concluded that the inference could be drawn that Bryant misrepresented his status in order to avoid arrest and thus that he demanded to obtain something of value as provided in the statute. *Id*.

21

Here, unlike the defendant in *Bryant,* Mr. Wright did not testify as to his state of mind when he presented the identification card and documentation to Ms. Schroeder and Ms. Parsons. However, based on his repeated statements to Ms. Schroeder and Ms. Parsons that he "wanted to get his pay straight" and that he had not been paid since February, the court concludes that he represented himself as a Second Lieutenant with intentions of restarting his Army salary. Moreover, by filling out the housing allowance and travel voucher forms and indicating his status as a Second Lieutenant on those forms, Mr. Wright at the very least attempted to obtain money from the finance office in that regard.[15]

After carefully and thoroughly considering the witnesses' testimony and exhibits presented at trial, the court concludes beyond a reasonable doubt that, on July 18, 2006, at Fort Leavenworth, Kansas, Mr. Wright did falsely pretend to be a Second Lieutenant with the United States Army, with the knowledge that such pretension was false, and acted as such and demanded money, in violation of 18 U.S.C. § 912. Accordingly, the court finds Mr. Wright guilty of the crime charged in Count 2 of the superceding indictment.

**IT IS THEREFORE ORDERED BY THE COURT** that the defendant Mr. Wright is guilty of the crime charged in Count 2 of the superceding indictment (doc. 39) and that judgment be entered accordingly.

---

[15]For purposes of violating the statute, it is irrelevant that Mr. Wright did not succeed in his attempt to obtain money. *See Laing v. United States*, 145 F.2d 111, 112.

**IT IS FURTHER ORDERED BY THE COURT** that the United States Probation Office prepare a presentence investigation report, and sentencing is set for Monday, October 29, 2007, at 1:30 p.m.

**IT IS SO ORDERED.**

Dated this 25th day of July, 2007.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge